FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2006 NOV 13 A 9: 31

CLERK US DISTRICT COURT

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE MINISTRY OF JUSTICE OF GEORGIA, <br><br> Petitioner, <br><br> v. <br><br> FOR THE DEPOSITION OF I. V. MAKAROV AND DOCUMENTS FROM ITERA INTERNATIONAL ENERGY LLC FOR USE IN A CONTEMPLATED CRIMINAL INVESTIGATION IN GEORGIA AND INTERNATIONAL ARBITRATION IN RUSSIA, CASE NO. 8/2006 <br><br> Respondents. | CASE NO. 3:06-mc-66-J-25TEM |

### PETITION FOR DISCOVERY IN AID OF
### FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

Petitioner Ministry of Justice of Georgia ("MOJ") respectfully petitions for discovery pursuant to 28 U.S.C. § 1782 in aid of foreign and international legal proceedings currently pending in Georgia and the Russian Federation relating to Respondent, Itera International Energy LLC ("Itera").

### FACTUAL BACKGROUND

**Georgia's Turn West**

1. The present petition is intended to assist the MOJ in a currently contemplated criminal investigation in Georgia and a pending international arbitration in Russia, which play an important role in the present Georgian administration's attempt to address and

overcome the legacy of widespread corruption that it inherited from the former Georgian regime.

2. Georgia, a former member state of the Union of Soviet Socialist Republics ("Soviet Union"), is a country of about four and a half million inhabitants located between the Black and Caspian Seas immediately south of the Caucasus Mountains. It shares borders with the Russian Federation, Azerbaijan, Armenia, and Turkey. Georgia's major exports are wine and spring water – the bulk of which, at least until recently, was exported to the Russian Federation, on which it has historically been highly dependent since the collapse of the Soviet Union in 1991. Indeed, for years, Georgia has relied on the Russian Federation for its energy supplies.

3. Georgia's post-Soviet relations with Russia have always been problematic, but they took a decided turn for the worse in late 2003 shortly after Georgia's former President, Eduard Shevarnadze, was ousted from power.[1] Thus began the so-called "Rose Revolution," which culminated, on January 4, 2004, with the democratic election of Mikheil Saakashvili as the new President of Georgia.

4. Educated and trained partly in the United States,[2] President Saakashvili immediately set about lessening Georgia's historical dependence on Russia and sought closer ties with the European Union, the North Atlantic Treaty Organization ("NATO"), and the United States.

---

[1] Shevarnadze had formerly been Foreign Minister of the Soviet Union under Mikhail Gorbachev.

[2] President Shevarnadze received an L.L.M. degree from Columbia University Law School in 1994 and practiced law in New York at Patterson, Belknap, Webb & Tyler LLP in 1994-95.

**Russian Retribution**

5.  This western reorientation of Georgia has met with strident opposition from Russia. In the spring of this year, Russia banned the import of Georgia's two main exports, wine and spring water, on the pretext that they did not comply with Russian health standards. This Russian ban has been widely perceived as Russian retribution for Georgia's new western orientation and an attempt to pressure Georgia into towing the Russian line.

6.  More recently, the Russian authorities have:
    - ceased issuing Russian visas to Georgian nationals;
    - severed all air, rail, sea, and postal communications with Georgia;
    - closed a number of Georgian-owned and Georgian-affiliated businesses in Russia;
    - ordered schools in Russia to supply the Russian Ministry of the Interior (the ministry responsible for the KGB's successor, the FSB) with lists of students' names that sound Georgian; and
    - begun rounding up Georgians living in Russia and deporting them to Georgia in cargo planes.

See Georgia chides Russia 'cleansing', BBC News, Oct. 7, 2006; Russia. The Hardest Word, The Economist, Oct. 14, 2006, at 29-30, true and correct copies of which are attached hereto as Composite Exhibit 1.

7.  The event provoking these most recent Russian acts of retribution was the arrest in Georgia on September 27, 2006 of four members of Russia's armed services on charges of espionage, even though shortly thereafter Georgia turned the four over to a representative of the Organisation for Security and Cooperation in Europe, which promptly repatriated them to Russia.

**Legacy of Corruption**

8. The Saakashvili administration has also focused on overcoming a legacy of government corruption, which had been endemic in Georgia under the Shevarnadze regime ("Old Regime"). Considerable progress has been made since the Rose Revolution. For example, a recent World Bank Group report ranked Georgia highest in terms of improved business environment for the years 2005-2006 (available at www.doingbusiness.org/main/Top10Reformers.aspx).

9. As part of the Saakashvili administration's anti-corruption campaign, the MOJ has brought several legal proceedings against persons connected with the Old Regime for various violations of the law committed while they held public office in Georgia. In general terms, those proceedings are based on Georgian statutes comparable to U.S. laws, like the Foreign Corrupt Practices Act (15 U.S.C. § 78m, et seq.) and the Racketeer Influenced and Corrupt Organizations Act (28 U.S.C. § 1961, et seq.), which criminalize bribery, embezzlement, money laundering, abuse of office, and conspiracy to commit such offenses.

**David Mirtskhulava**

10. Among such proceedings is one currently pending against the former Minister of Energy under the Old Regime, David Mirtskhulava, for violation of Articles 332 and 333 of the Criminal Code of Georgia. In that proceeding, Mirtskhulava is accused of exceeding his authority during his tenure as Minister of Energy. Mirtskhulava is currently incarcerated in Georgia.

11. As Minister of Energy under the Old Regime, Mirtskhulava also apparently had a number of dealings with the Respondent, Itera, a company organized under the laws of the State of Florida with its headquarters and principal place of business in this judicial district, namely: 9995 Gate Parkway, Jacksonville, Florida, 32246.

WHITE & CASE LLP  Wachovia Financial Center, Miami, Florida 33131-2352  Tel+ 1 305 371 2700

12. On information and belief, on at least one occasion, Mirtskhulava met U.S. Congressman, Representative Curt Weldon of Pennsylvania ("Representative Weldon"), when Representative Weldon accompanied Itera representatives to Russia and Georgia in 2003. The U.S. press has widely reported that Representative Weldon has had close contacts with Itera for a number of years (described more fully below).

**Itera in Georgia**

13. Itera was extremely active in the energy business in Georgia under the Old Regime (i.e., in the years leading up to and including most of 2003). It often acted out of its Jacksonville, Florida office (as evidenced by the corporate stamps used by Itera on the various agreements), as well as its Moscow and Cyprus offices (which Itera used primarily for notices under agreements).

14. More specifically, shortly before the Rose Revolution, Mirtskhulava, ostensibly on behalf of the Georgian Ministry of Energy ("MOE"), allegedly signed one or more purported agreements with Itera in or about 2003.[3] Under these agreements, the MOE allegedly guaranteed in Itera's favor the performance of an obscure Georgian company called "Sistema" in connection with its purchase of natural gas from Itera in Georgia under the Old Regime.

**Invalid Agreements**

15. The MOJ suspects that the timing of these agreements – some months before the Rose Revolution – was not fortuitous; rather it likely resulted from a reasonable apprehension on the part of the parties involved, and of Itera in particular, that a regime change in Georgia could have a detrimental effect on Itera's influence in Georgian

---

[3] These agreements have since been invalidated.

government circles. The agreements were found to be otherwise suspect as well because they bear certain indicia of fraud.

16. Accordingly, on March 9, 2006, the Georgian Ministry of Finance ("MOF") filed a complaint ("Complaint") against the MOE before the Administrative Affairs Collegium of the Tbilisi Municipal Court ("Municipal Court").

17. The Complaint sought a declaration judgment that two agreements apparently signed by Mirtskhulava are null and void, namely:

- Agreement No. 03-910/02 (undated), allegedly executed by Mirtskhulava for the MOE and I. V. Makarov for Itera ("Mirtskhulava Agreement") (a true and correct translation of the Mirtskhulava Agreement with Russian-language original is attached hereto as Exhibit 2); and

- Surety Agreement No. 03-162/03, dated July 14, 2003, allegedly executed by Mirtskhulava for the MOE, Yu. D. Pyanykh for Itera, and L. Levanishvili for Sistema ("Surety Agreement") (collectively and with "Mirtskhulava Agreement", the "Agreements") (a true and correct translation of the Surety Agreement with Russian-language original is attached hereto as Exhibit 3).

18. After a hearing on the matter, by decision dated September 12, 2006, the Municipal Court found the Agreements invalid. A true and correct translation of the Municipal Court's September 12, 2006 decision is attached hereto as Exhibit 4.

19. The Municipal Court held that Mirtskhulava had no authority to bind the MOE to the Agreements, which caused direct damage to the state budget of Georgia. More specifically, the Municipal Court held that enforcement of the Agreements would violate Article 66 of the General Administrative Code of Georgia and Article 14 of the Georgian law "On Structure and Rules of Activities of Executive Power." See Exhibit 4.

20. In sum, Mirtskhulava acted manifestly beyond his powers in purportedly signing the Agreements under circumstances that raise serious questions about

Mirtskhulava's possible illicit dealings with Itera and about possible inducements he may have received to act in breach of the public trust placed upon him as Minister of Energy.

**Itera's Reputation**

21.     The MOJ's suspicion of possible nefarious dealings between Mirtskhulava and Itera is based on the peculiar circumstances of the matter in Georgia and is bolstered by recurring reports dating from about the relevant period that allege suspicious dealings by Itera elsewhere.

22.     One report, contained in BusinessWeek Online, notes that "[s]ome minority shareholders of Russia's Gazprom, the world's largest gas company, suspect that Gazprom managers helped create Itera as a vehicle to park choice assets siphoned from Gazprom for their own personal enrichment." Russia's Shadowy Giant, Gas Supplier Itera's Clout Extends Across the Old Soviet Empire, BusinessWeek Online, Apr. 2, 2001, a true and correct copy of which is attached hereto as Exhibit 5. The same article further notes that Itera has been the focus of investigation by United States law enforcement authorities: "Russia's audit chamber . . . has joined hands with U.S. law-enforcement officials in probing alleged illegal dealings, including possible money-laundering through U.S. institutions." Id.

23.     The distinguished U.S. Russia expert, Marshall Goldman (Professor Emeritus, Harvard University), concluded that the "prize for asset stripping from Gazprom ... probably belongs to ITERA." Marshall I. Goldman, The Piratization of Russia 110-112 (Routledge, Taylor & Francis Group 2003), a true and correct copy of which is attached hereto as Exhibit 6.

24.     Itera has also recently been implicated in the case of Pavlo Lazarenko, former Prime Minister of Ukraine, who was recently sentenced to nine years imprisonment by the U.S. District Court for the Northern District of California for extortion and money laundering. Press Release, United States Department of Justice, (August 25, 2006) (on file

with the United States Department of Justice), a true and correct copy of which is attached hereto as Exhibit 7.

25. The MOJ understands that Itera Vice President, Ted Kavalieros, testified before a grand jury in connection with the Lazarenko case on April 1, 2004. Mr. Kavalieros testified to the effect that "in the summer of 1996 he transferred $25 million in seven payments to an account held in a Swiss bank by Bainfield Company Ltd. without knowing who this company was and why it received this money," although another witness testified that Lazarenko owned 51% of Bainfield at the time. Itera Says It Did Not Bribe Lazarenko, Gateway to Russia, Apr. 7, 2004, a true and correct copy of which is attached hereto as Exhibit 8.

### FBI Investigation

26. Most recently, according to reliable press reports, the Federal Bureau of Investigation ("FBI") has launched an investigation centering on Karen Weldon, daughter of Representative Weldon, in connection with her alleged lobbying and consulting work on behalf of Itera and other entities with whom her father maintained contacts.

27. According to available information, on October 15, 2006, the FBI raided the "homes of Rep. Weldon's daughter and a close friend" and searched "four locations in the Philadelphia area and two in Jacksonville," where Itera maintains its headquarters. FBI Raids Homes of Weldon's Daughter, Friends in Contracts Probe, The Wall St. J. Online, Oct. 16, 2006, a true and correct copy of which is attached hereto as Exhibit 9.

28. On October 18, 2006, The Moscow Times confirmed that the FBI had in fact searched the premises of Itera's Jacksonville office in connection with the Weldon investigation. Itera Past Haunts U.S. Lawmaker, The Moscow Times, Oct. 18, 2006, a true and correct copy of which is attached hereto as Exhibit 10.

## Georgian Criminal Investigation

29. In light of the indicia of fraud and other possible malfeasance surrounding the Mirtskhulava-Itera relationship, as well as the considerable circumstantial evidence of Itera's business practices, the MOJ has good reason to suspect that Itera may have been involved in improper and/or illegal dealings with Mirtskhulava.

30. Accordingly, the MOJ believes that a criminal investigation into Mirtskhulava's dealings with Itera is warranted and appropriate ("Criminal Investigation"). Specifically, the MOJ is currently contemplating the commencement of a formal criminal investigation into the circumstances surrounding Mirtskhulava's involvement with Itera in connection with the Surety Agreement and Mirtskhulava Agreement. See October 25, 2006 Letter from the Ministry of Justice, Gia Kavtaradze, to the United States District Court of the Middle District of Florida, a true and correct copy of which is attached hereto as Exhibit 11.

31. Indeed, the MOJ likely would have already commenced the Criminal Investigation had it not been hampered by, among other things, the Russian embargo on Georgia.[4] Further, the MOJ cannot obtain visas for its nationals to conduct necessary examinations of evidence or witness interviews in Russia. It cannot gain access to the alleged "originals" of the Surety Agreement and Mirtskhulava Agreement that are at the core of the Criminal Investigation. Without access to the "originals," the Criminal Investigation is essentially stalled.

## Moscow Arbitration

32. In addition, the MOE is currently defending itself in a Moscow arbitration brought by Itera under the Surety Agreement at the International Commercial Arbitration Court ("ICAC") at the Chamber of Commerce and Industry of the Russian Federation in

---

[4] As a result of the embargo, Georgia can obviously expect no cooperation from the Russian authorities.

Moscow, Case No. 8/2006 ("Moscow Arbitration"). In the Moscow Arbitration, Itera seeks damages of approximately $7 million. A true and correct translation of Itera's request for arbitration with Russian original is attached hereto as Exhibit 12.

33.  The MOE's ability to defend itself in the Moscow Arbitration is likewise severely hampered, if not extinguished, by the Russian embargo.

34.  In fact, forensic experts from Georgia are not being permitted to enter Russia to examine the so-called "original" Surety Agreement (which bears clear indicia of fraud in the available copy) and other documents on file at the ICAC in Moscow. Additionally, the Russian embargo has impaired the MOE's ability to gather evidence and interview witnesses and will prevent the MOJ and/or MOE representatives from attending any hearing in Moscow, which they have a right to attend.

35.  In light of the prejudice to Georgia caused by the Russian embargo, the MOE petitioned the arbitral tribunal for an indefinite adjournment of proceedings in the Moscow Arbitration. That petition was granted on or about October 30, 2006.

## APPLICATION OF 28 U.S.C. § 1782

36.  Pursuant to 28 U.S.C. § 1782(a):

> The District Court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusations. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

37.  The MOJ's Petition fulfills the above requirements under 28 U.S.C. § 1782(a).

WHITE & CASE LLP   Wachovia Financial Center, Miami, Florida 33131-2352   Tel+ 1 305 371 2700

38.     <u>First</u>, the parties from whom discovery is sought are located within this District. Not only is Itera's corporate address identified as Jacksonville, Florida, but I. V. Makarov is also "found" within this district. Makarov serves as an executive officer of Itera International Energy Corporation and is Chairman of the Board of Directors of Itera USA, Inc., which both have a principal place of business in Jacksonville, Florida. True and correct copies of extracts from the 2006 Annual Reports of Itera International Energy Corporation and Itera USA, Inc., which were filed with the Florida Secretary of State, are attached hereto as Composite Exhibit 13.

39.     <u>Second</u>, the currently contemplated Criminal Investigation qualifies as a "proceeding in a foreign . . . tribunal." <u>Intel Corp. v. Advanced Micro Devices, Inc.</u>, 542 U.S. 241, 258-59 (2004) (holding that, under 28 U.S.C. § 1782, "Congress[] recogni[zes] that judicial assistance would be available 'whether the foreign or international proceeding *or investigation* is of a criminal, civil, administrative, or other nature'" and "does not limit the provision of judicial assistance to 'pending' adjudicative proceedings," but must merely "be within reasonable contemplation").

40.     Similarly, the Moscow Arbitration qualifies as a "proceeding in a foreign . . . tribunal." <u>Id.</u> at 258 (endorsing the view that the term "foreign tribunal" includes "'investigating magistrates, administrative <u>and arbitral tribunals</u>, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts'") (<u>quoting with approval</u> Hans Smit, <u>International Litigation under the United States Code</u>, 65 Colum. L. Rev. 1015, 1026-27 and nn. 71 & 73 (1965) (emphasis added)).

41.     <u>Finally</u>, the MOJ is an "interested person" within the meaning of 28 U.S.C. § 1782. <u>See</u> <u>Intel Corp.</u>, 542 U.S. at 256 (holding that the term "interested person" is intended to include "foreign sovereigns, and designated agents of those sovereigns" and "litigants

before foreign or international tribunals . . . as well as any other person . . . [who] merely possess[es] a reasonable interest in obtaining the assistance").

42.     Pursuant to 28 U.S.C. § 1782, Petitioner seeks to obtain evidence consisting of relevant and material records of third parties for use in the Criminal Investigation and Moscow Arbitration.

## THE SUBPOENAS

43.     To that end, Petitioner intends to serve Itera with a request for production of documents. A copy of the proposed subpoena to Itera and request for production is attached hereto as Exhibit 14.

44.     Petitioner also seeks to take the deposition of I.V. Makarov. A copy of the proposed subpoena and Notice of Deposition for I.V. Makarov is attached hereto as Exhibit 15.

45.     As explained previously, the discovery sought through this Petition is necessary because:

   a.     The Mirtskhulava Agreement was allegedly signed by I. V. Makarov on behalf of "Itera International Energy L.L.C. USA" according to the corporate seal affixed to this document;

   b.     Itera appears to have acted out of its Jacksonville, Florida office when it filed a request for arbitration against the MOE in relation to a dispute over the Surety Agreement. In its request for arbitration, Itera provided the address: "9995 Gate Parkway, Jacksonville, Florida 32246 USA" (but requested that notices be sent to a Moscow, Russia address); and

   c.     Itera, as party to the Mirtskhulava Agreement and the Surety Agreement, and I. V. Makarov, as purported signatory of the Mirtskhulava Agreement, can

13

reasonably be expected to possess evidence directly relevant to both the Criminal Investigation and the Moscow Arbitration, including "original" documents, drafts, correspondence, financial information, and other evidence bearing upon the circumstances surrounding Mirtskhulava's alleged signing of those Agreements.

47.   Granting this Petition will permit the Petitioner to obtain important evidence in the form of relevant and material records for use in the Criminal Investigation and the Moscow Arbitration.

## CONCLUSION

For the foregoing reasons, Petitioner, Ministry of Justice of Georgia, respectfully requests that this Court enter an order granting the Petition and permitting service of the proposed subpoenas and discovery, attached hereto; compelling Respondents to comply with the discovery served; and allowing further follow-up documentary discovery based on information obtained through this proceeding. A proposed order for the Court's consideration is attached hereto as Exhibit 16.

Respectfully submitted,

WHITE & CASE LLP
Attorneys for Petitioner,
Ministry of Justice of Georgia
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

By: *Sarah E. Davis* [signature]
Sarah E. Davis, Esq.
Florida Bar No. 125652

Dated: November 10, 2006